## P. Bannon Pipe Company v. Craig, Jr.'s, Administrator.

(Decided December 1, 1925.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Second Division).

Municipal Corporations—Instruction Not Charging as to Duty of Driver Based Upon Whim or Impulse of Deceased Child Held Not Erroneous.—In action for death of child struck by truck, instruc-

tion as to duty of driver held not erroneous for failure to include statement as to driver's duty after he saw or should have seen deceased so near path of truck that, through childish whim, impulse, or heedlessness, he might come or run in front of truck.

SELLIGMAN & SELLIGMAN and NORTON L. GOLDSMITH for appellant.

WILLIAM S. HEIDENBERG and WALTER P. LINCOLN for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

The verdict and judgment for $7,500.00 for the death of a five-year-old child, run over by a truck of appellant, P. Bannon Pipe Company, on a street in Louisville, is assailed upon this appeal as erroneous, and a reversal sought upon several grounds, chief among them being (1) that there was not sufficient evidence introduced by the administrator of the Craig child to entitle him to have the case submitted to the jury; (2) that the company's motion for a peremptory instruction should have been sustained; (3) that the instructions given by the court were erroneous, and (4) that the trial court erred to the prejudice of appellant company in granting a new trial from the first verdict and judgment, and appellant now insists that the second judgment and verdict be set aside and the first verdict and judgment be substituted therefor. On the first trial the verdict was for the appellant company, and the evidence upon that trial appears to have been the same in substance as upon the second trial. No witness who testified for either side was able to give the details of the accident save Ewing Winston, the truck driver, and his helper, Dewey Scott, who was on the truck with him. Only one witness for the plaintiff, Marion Elmore, saw the child at the time of the accident, and he was unable to say how the accident happened except that he saw the truck strike the child, but how the child came to be in the street, where it came from or how long it had been there the witnesses did not know. Elmore's evidence upon the subject was as follows:

"17.  What first attracted your attention to the accident?  A.  I don't know.  I just happened to

look up and saw it, just walking along down the street and happened to see it.

"Q. As you looked up, tell the jury in your own way what you saw? A. I looked up and seen the truck hit the boy and run over him and kill him.

"Q. Where was the child when you first saw it? A. It was bumping him right out in front of the car.

"Q. He hadn't been knocked down yet? A. It was bumping him right up against them wheels in the front.

"Q. Was he on his feet? A. No, sir; when I looked up he was sort of bumping him out in front of the truck.

"Q. Rolling along? A. No, sir, was not rolling along, bumped up a time or two by the wheel, finally got him down like that.

"Q. And the first you saw of it, the child was right in front of the truck? A. Yes, sir, that was the first I seen of it.

"Q. How long had he been there you don't know? A. No, sir.

"Q. Which side of the road he came from you don't know? A. No, sir; when I seen him he was up on the east side of the road against the truck.

"Q. The truck was actually in contact with him? A. Yes, sir."

From the evidence of the other six witnesses testifying for plaintiff it only appears that the child was killed; that some of them saw the truck just before and after it struck the child but did not see the child or know just how the accident happened; that upon going to the scene of the accident they observed the truck standing on the street some thirty or forty feet from where the lifeless body of the infant lay; that they observed truck tracks on the street swerving to the left in the direction in which the truck traveled, but what caused the truck to swerve no one of the witnesses was able to say. At the conclusion of the evidence for the plaintiff the defendant company moved for a directed verdict in its favor, but this motion was overruled, although it is very hard to see from the evidence for plaintiff unexplained, wherein the company or its driver was guilty of culpable negligence, if indeed there was such negligence. After that motion was overruled, the defendant

introduced Winston, the driver, who testified as follows with respect to the accident:

"A.   Well, how come me to run over the little child; there was two little boys up on the railroad playing and just as, well, I saw them just a little while before I got to them, but I was right at them almost.   Then just as I got ready to pass them I guess—I don't know exactly how far I was from them, but one grabbed up a handful of cinders to throw at the other one, and he ran right down off the embankment right in front of the truck.

"37.   When he ran off the embankment and in front of the truck, what did you do to avoid hitting him, if anything?   A.   When he ran off the bank the bumper of the truck knocked him down; I cut my truck to the left over in to the ditch and I was about to get into the ditch and turn my pipe off of my truck. and I pulled up on the road again, back up into the road again.

"38.   What, if anything, did you do to stop the truck?   A. When I knocked him down I applied both brakes, my emergency brake and foot brake, pulled my emergency brake with my hand—

"39.   Did you do that, or not, as soon as you saw him start across to try to stop?   A. Yes, sir; no sooner than he ran right off the bank I grabbed my brake and turned my wheel all at the same time.

"40.   As soon as you saw him run off the bank you did what?   A. Applied my emergency brake and foot brake, and turned my steering wheel with my left hand, over to my left.

"41.   What did you do with your feet, if anything, try to stop?   A. Pushed in on my clutch and brake.

"42.   Tell the jury, some might know and some not, what are the different methods by which a truck may be stopped, what did you have?   A.   To stop it when?

"43. So you are doing your best.   A. Doing it the best I knowed to stop it without killing your motor, as pushing on your clutch that releases your motor from your works.

"44.   When you press on your clutch to get it clear, that disconnects the engine from the truck? A. Yes, sir.

"45. And the engine can keep running without applying any power to the truck? A. Yes, sir.

"46. That is the same as if you stopped your engine? A. Yes, sir.

"47. What device is there for the right foot to operate? A. That is for your clutch—your brake for the right foot.

"48. Your left is the clutch and right for the brake? A. Yes, sir.

"49. What other brake is there? A. An emergency brake, you pull by hands.

"50. Is there anything else besides throwing out the clutch, or pressing on the foot brake, and pulling on the emergency brake, a person can do to stop the truck? A. No, sir.

"51. Did you do all those things when the boy started to run off the bank? A. Yes, sir.

"52. How soon after you saw and knew he was going to start, did you do it? A. No sooner than he started off, I didn't do it before he started off; I didn't know he was coming off.

"53. But as soon as he started off you did those three things? A. Yes, sir.

"54. What did you do in the way of guiding the machine out of the way? A. I pulled it to the left—after it didn't strike the boy I pulled it to the left, and the front wheels passed by him and didn't touch him, and I was about to get over in the ditch and miss the tree and I pulled back to my right; I had the hind wheels sliding then; the wheel was on the little boy's head, and I released my brakes and they rolled off him.

"55. Why did you release your brakes? A. I looked back this way and seen the wheel was on the little boy's head; I released by brake to let it off.

"56. Did your machine roll on a little further? A. Yes, sir.

"57. Did it roll farther than if you hadn't released the brakes? A. No, sir.

"58. After you rolled over the boy, did it go farther than if the brake had stayed on? A. After I rolled over and let the brake off, it went a little farther, about five feet, I guess.

"59. Winston, did you do everything you knew how to stop that truck and avoid hitting the boy

as soon as you saw him coming off of that bank? A. Yes, sir.

"60.  Do you know how far up the bank he was —was he sitting down on the slope of the ditch? A. No, sir, he wasn't on the slope, he was sitting right next to the track.

"61.  That is right at the top of the slope, is it? A. Yes, sir.

"90.  Now, about how far to your right, to the right of the place you would have passed the boy if you had kept on straight, were you, when he jumped up and started across the road? A. How far to the left was he?

"91.  How far to the right of where you would have passed him? A. I don't know how far to the right of me he was; he was right up on the bank.

"92.  Was he walking, or how? A. No, sir, running.

"93.  Top speed, or slowly, or how? A. Fast as he could jump right up and run down right fast.

.   .   .

"A.  I struck him when he was right in the center of the road, when he jumped and ran down the bank—wasn't no hollow for him to pass there, he just jumped off the bank.

"134.  He came off the slope? A. Yes, sir.

"135.  You saw him when he jumped up? A. Yes, sir.

"136.  He came all that distance while you were running six feet? A. I didn't know he was coming down the bank.

"137.  When did you begin to apply your brakes? A. No sooner than I saw him start up and down the bank.

"138.  Had he reached the road before you applied your brakes? A. No, sir; when he jumped up and started down the bank, I started to cut out and apply my brakes.

.   .   .

"154.  Now, Ewing, how long had you noticed that boy, or these two boys, sitting there right by the rail of the railroad track, when you saw one of them jump up—how long had you noticed them sitting there? A. I don't know exactly how long I noticed

them sitting there, but I seen them a right smart little while before I got to them.

"155. And they continued to sit there until you were almost opposite? A. Yes, sir."

The company then called Dewey Scott, the man who accompanied the truck, and he testified as set out below:

"20. What did he do just immediately before the accident the last thing you saw him do on the bank? A. Just the moment before, the last I see of him, he darted right down across in front of the truck.

"21. When he first started to run toward the road, how far was the truck away from the point, where he was about to cross the road, about how many feet? If you don't know in feet, show some object in this room? A. About as close as from me to this desk.

"22. This table? A. Yes, sir.

"23. About from you to here? A. Yes, sir.

"24. He was about that far, would have to cross that far ahead of your truck south of you, you mean? A. Yes, sir, that is as close as I seen him to the truck.

"25. When the boy started to run across this distance in front of you, what did Winston do with the machine he was driving? A. Winston cut to his left.

"26. What else did he do? A. And then when the boy—when the bumper knocked him down—Ewing swung right back to the right in order to miss him, and then the little boy must have rolled into the gutter, and when Winston cut back to his right the truck ran up on him before he could stop; he applied both brakes and his clutch in order to save the little boy.

"27. He applied both brakes? A. Yes, sir, and his clutch.

"28. Threw out his clutch? A. Yes, sir.

"29. After running over the boy, which way did the truck swing? A. Swung back to the right."

If there had been evidence for the plaintiff tending to show that the company or its driver had been negligent in the operation of the truck at the time of the acci-

dent, the evidence given by the driver and his helper would appear to be sufficient to explain it away and to entitle the company to a verdict in its favor. Upon the first trial, where the evidence was practically the same, the court instructed the jury as follows:

"1.  It was the duty of the driver of the truck of the defendant, P. Bannon Pipe Company, at the time in the evidence referred to, to run his truck to the right of the center line of Louisville avenue, to run it at a reasonable rate of speed, to keep it under reasonable control, to keep a reasonable lookout ahead for persons or vehicles upon the street in front of him or so nearly in front of him as to be in danger of being struck by his truck, and at such place, if any, as he saw, or by the exercise or ordinary care could have seen, a child in front of him, or near enough in front of him as to be in danger of being struck by his machine, to give timely warning of his approach by sounding his horn, and if he saw, or by the exercise of ordinary care could have seen, a child or children approaching the roadway on which he was driving in a way that he could reasonably anticipate that they, or one of them, would come upon the roadway in front of his truck, or near enough to be in danger of being struck by his truck, then it was his duty to use such care as an ordinarily prudent, careful man would use under like or similar circumstances to so run and operate his truck as to avoid coming into collision with such person upon the street, if any there was, and if you believe from the evidence in this case that the chauffeur in charge of the truck failed in said duties, or any one or more of them, and thereby caused his truck to come into collision with the plaintiff's decedent, Arrie Thomas Craig, Jr., and thereby caused his death, then the law of the case is for the plaintiff, and you should so find.

"But unless you so believe, the law of the case is for the defendant, and you should so find."

After motion and grounds for new trial had been filed the court suggested to counsel that it was not satisfied with the foregoing instructions which it had given, whereupon the grounds for new trial were amended, and, the court, after consideration of the motion for new trial,

delivered a carefully prepared opinion sustaining the motion for new trial on the grounds that the instructions did not properly advise the jury of the duty owing by the driver of the motor vehicle upon a highway to small children upon the street, or in the pathway of the truck on the highway or so near to it as to put upon him an added duty of alertness in anticipation of childish whim, heedlessness or thoughtlessness in dashing or running into the street immediately in front of a moving vehicle, and decided that the instruction copied above should have contained the following:

> "Or if you believe from the evidence that the driver of the truck saw or by the exercise of ordinary care could have seen the said Arrie Thomas Craig, Jr., so near the path of his truck that the said Craig through childish whim, impulse, heedlessness or thoughtlessness of small children such as he was, might come or run in front of the truck so as to be injured thereby, then it was the duty of the truck driver to be on the alert as to the movement of the child and to exercise ordinary care to run his truck at such rate of speed and to keep it under such control that in the exercise of ordinary care and the use of the means at hand he could avoid striking and injuring the said Craig."

We have carefully examined the instructions given on the first trial and find they conform substantially in all respects to instructions approved in similar cases by this court. Nor have we been able to find a case in this jurisdiction where an instruction embodying the thought embraced in the amended instruction above copied, which was embraced in the instructions given by the court to the jury upon the last trial, was approved. While we find no substantial objection to the principle of law embodied in the amendment, it has never been recognized as the law of such cases by this court, nor embodied in an instruction in similar cases which have been approved by this court. We are, therefore, of the opinion that the instructions given by the trial court upon the first trial properly presented the whole law of the case, and the court was in error in granting appellees a new trial from the first verdict and judgment and in awarding them a second trial. It follows, therefore, that the judgment appealed from must be reversed, with directions to the

lower court to set aside the second verdict and judgment and substitute in lieu thereof the verdict and judgment resulting upon the first trial of the case.

Judgment reversed.